Mr. Lee, whenever you're ready. Good morning. Good morning. Good morning. Matthew Lee for Appellant Eugene Niksich. I'm joined today by my colleague Mr. Kenton Coppedge. Your Honors, the district court committed three errors in this case, the warrant reversal. The first relates to our defense of the court in satisfaction. And in that regard, Your Honors, this appeal is about basic fairness, good faith, and holding the Internal Revenue Service to account and to its bargain. Here, the parties reached an agreement to settle their dispute regarding penalties for Mr. Niksich's failure to report his foreign bank accounts. The IRS told Mr. Niksich that if he paid a sum of money, $419,000, his penalty issue would be resolved and the case would be over. Is there anything in the record that reflects that the agents had the actual as opposed to the apparent authority to enter into the closing agreement with Mr. Niksich because that is what is required, right? Certainly, Your Honor, the government in its papers makes much of the authority question and I'm happy to address that, but I want to make one thing very clear here. Our accord in satisfaction defense, affirmative defense, which is based upon, again, the agreement that the parties reached to resolve a disputed claim by payment of a sum of money and Mr. Niksich's, in fact, payment of that money, the government, the IRS negotiated his check and kept his money and, in fact, continues to hold his money to this day. That defense... But they say that's because you haven't requested it back and that that would cause you harm in your accord in satisfaction claim because if you ask for it back, they give it back to you and then one of the legs of the accord in satisfaction claim is gone. Your Honor, the record's clear that we did, in fact, ask for the money back. Not in the proper way. We asked for the money back orally when there was a telephone conversation between... The IRS doesn't give people money back through a phone call. That was done... That was the first part. Then we wrote... Then we made a written request for the return of the money. But there's a procedure... There's a written procedure that you have to go through to get money back from the IRS that's in the U.S. Treasury and, as far as I can tell from the record, that procedure wasn't followed by your client. Is that right? It's our position, Your Honor, that the moment that the IRS repudiated this agreement and said we are not going to hold up our end of the bargain that was agreed to, the money should have been returned instantly. But the argument is not that there was a repudiation, but that there was never an agreement to begin with because it wasn't accepted by the Commissioner of the Internal Revenue Service. Well, Judge Russell, let me come back to your question that you asked a moment ago about the closing agreement. It's our position that the closing agreement is a side issue. The written document, the Form 906 Closing Agreement, that's a side issue. Our accord and satisfaction defense doesn't rise or fall on whether the closing agreement was executed by someone with authority at the IRS. This was, the accord and satisfaction occurred irrespective of whether there was a formal written document. And also to your question about authority. Your position is that the accord and satisfaction occurred by lieu of payment? By, sorry, Your Honor? By delivering the check? That was, well, that's certainly an element of the accordance. That was the satisfaction of the element of that doctrine that followed upon the accord, which was the agreement that the parties reached to settle a disputed claim. Right, but then going back to the closing agreement, the closing agreement, I understand, is signed by your client. But then it specifically says that Agent, I can't remember his name now. Agent Ford. Agent Ford signs that he recommends that this agreement be executed. But the commissioner obviously doesn't sign. And then no one, I guess, who has actual authority, and I guess actual authority would be someone in the technical support group manager? That's the government's position about who had authority to approve the closing agreement. Correct? Well, I'd like to ask you, because I didn't see anything in the record. Is there anything in the record that actually discusses or establishes who actually had actual authority to sign that closing agreement on behalf of the government? In the record below, there are a number of references to both the Internal Revenue Manual, Internal IRS Guidance, and some delegations. Are there actual names of individuals who would be able to sign that document? No, there are no names, no individuals named. That's correct. Your argument has to be, then, that Agents Ford and Counts had the actual authority to bind the IRS, and that can't be true. Your Honor, in, and I want to make a reference to, I do want to make a reference to the Internal Revenue Manual, which is a document that the government relies so heavily upon. We cite this in our opening brief at page 21. There is a provision in the Internal Revenue Manual, it is section 4.26.16.6.7, again, we cite it in our opening brief at page 21, that says that examining agents, which in this case would be the revenue agent, Daniel Ford, who was the primary point of contact for Mr. Nixitch throughout the entire process, the administrative process below, before the  It says that examining agents have discretion to determine the amount of FBAR penalties that are warranted, anywhere from zero, no penalties warranted, up to the full amount of the statutory provision. But that is a discretion that is in But that's not the same thing as a compromise. It's one thing to set the penalties, which are to a degree discretionary, but it's another thing to settle a disputed FBAR issue. Are those two things the same or different? Well, if I may just finish my point, and I'll answer your question, Your Honor, in the context of doing that, that Internal Revenue Manual provision says that, again, examining agents have the discretion to determine the amount of the FBAR penalty, and it only requires written approval of their manager, which we have here. The record is very clear that Daniel Ford, the agent, negotiated what he thought was the appropriate amount of the FBAR penalty to be paid here. It was approved by his manager. What was the point, then, of Counselor Taylor, the IRS attorney, being involved in these negotiations? Our understanding is that she was part of the overall examination team at the IRS, and it's clear from the record that she also signed off on this. She approved it. We got internal records through Discovery, and it is clear that all three of them thought this was a good settlement. They congratulate themselves in internal email, saying this is a favorable settlement for the government, and well done, job well done. So, that is our position on authority, and in addition, at no time was Mr. Nixitch or his representatives ever told that Agent Ford or his manager, Mr. Counts, or the IRS counsel, Attorney Taylor, didn't have the authority to negotiate with him over the scope. It's a different thing to negotiate than to approve, and doesn't the language of the closing agreement itself indicate to you that Agent Ford did not have the authority to compromise the dispute? That is what the closing agreement says, correct, Your Honor. We don't dispute that. The closing agreement, correct, also was not signed, but again, that's our position, is that the closing agreement doesn't... But once you get a closing agreement that says, you know, this manager, you're negotiating with this person, this person then signs, it says, I recommend, don't you pick up the phone then to Counselor Taylor and say, hey, who has the authority to sign this closing agreement? Well, I mean, we were told over, we, Mr. Nixitch was told over the phone that the settlement wasn't going to be approved, and we said, as you would expect, send us our money back. I mean, if this is, I just, I think it's important to point this out, if this had happened in a private context, between two private litigants, where there was an exchange of money, there was an agreement, and then one party backed out, it didn't return the money. The difference is that it's the government involved, and the government representative has to have the actual authority to bind the government. So it's not a private agreement between two parties. Your Honor, we do, though, our position is that there was authority here on the part of the examination team to negotiate this, and simply, they should have returned the  But they haven't. Five years later, we're here today, the government, the IRS still has the money. Well, let me ask you this, and going back to the first issue, did Mr. Nixitch lie on his 2006 income tax return, when he said he doesn't have money in foreign accounts, when he checked the box, no? Certainly that was not an accurate statement. Okay. So why would a jury find him credible when he say I was negligent, and not reckless, in order to support a willfulness determination? It's our position that on the willfulness question that we presented below, sufficient counter evidence to the government's evidence of willfulness, such that at a minimum, there was a genuine issue of material fact that should have precluded summary judgment. This is a willfulness, it's a question of Mr. Nixitch's state of mind. It's an inherently fact-based question. And we What did he say when he was deposed, about why he took the actions he took? He testified credibly that he didn't know that he was required to report his foreign bank accounts until 2013 or 14, and the district court agreed with him on that, made a finding that that was credible. He testified, for example, that Well, that's hard for a jury to make that determination. He was a sophisticated businessman, he was the chief executive officer of a global sporting goods company, he prepared his own tax returns, he lied in 2006, then he left the box blank six years later. It seems like that's clearly objective recklessness. With respect to, these bank accounts weren't all in Switzerland, there were some in Panama, he testified that he intended to retire to Panama, he intended to take up residency in that country, all of these facts were presented, he made very clear to the banks in Panama that he was a U.S. citizen, we believe those are all as evidence that He was trying to basically, I don't want to use the word hide, because that has connotations, but he was trying to put money somewhere where it couldn't be reached, right? He was very candid about, at the outset, that the reason he opened these bank accounts overseas in the very first place was because he was concerned about creditors and he was concerned about his wife, whom he was divorcing. Your Honor, I see my time is cutting me very short, we do have another 8th Amendment issue which I'm happy to address if there are questions. Go ahead, go ahead and give him two minutes, please, Mallory. Thank you, I appreciate it, Your Honor. On the 8th Amendment question, this was, we believe this was another error that the district court committed, the district court held that the 8th Amendment did not apply, does not apply to FBAR penalties, as a matter of law. The government agrees that there's error now in light of one of our cases, but the question is whether it should go back, and so tell us why you believe the case should go back to address, like, tell me what the 8th Amendment argument is going to be by your client as to the penalties. The case should certainly be remanded, that is our position, because there was never an opportunity below. I know that, but tell me what the 8th Amendment challenge is going to be to the penalties as currently stated. As this court held in Schwartzbaum following the Supreme Court's decision in Bajikagian a number of years ago, there are a number of factual factors that have to be addressed to determine, in determining the excessiveness question. One of those is the relative culpability of the defendant relative to other potential offenders of the statute in question. So we would present evidence of Mr. Nixitch's culpability relative to others. There's a question of what harm he caused by his violation. That was not presented. We would present evidence of the harm, if at all, that Mr. Nixitch caused to the United States government as a result of his conduct. None of this was developed below, and we simply ask for a remand so that this matter can be addressed by the district court in the first instance. All right. Thank you very much. Thank you. You saved your time for rebuttal. Okay, Mr. Johnshop. May it please the Court. I'm Matthew Johnshop. I represent the United States. Today I'd like to start with the excessiveness issue and particularly maybe just sort of unpack and highlight how I think Schwartzbaum II applies to this case. Schwartzbaum obviously cut new ground. It held that the excessive fines clause does apply to FBARs. It also makes clear that it's a pure question of law, and because of the way the willful FBARs arise, it goes against— But isn't the determination about whether a fine is excessive fact-intensive? I think it looks at facts, but I'm not sure it's that fact-intensive. So, you know, if we look at Schwartzbaum, it says that the willful penalties arise account-by-account, year-by-year, so the analysis has to go account-by-account, year-by-year. And then the facts—the main fact, I think, is the harm caused by the defendant. But this Court's already clarified that the FBAR's specific harm analysis, the harm sought to be ameliorated was the amount of money concealed abroad in the accounts each year. So that's, I think, the main fact that you need. The other facts, I think, flow directly from Schwartzbaum. So is this a person at whom the statute was principally directed? Yes. This is someone who willfully hid their money in a foreign account and failed to disclose it. How do the penalties compare to other penalties authorized by the legislature? Schwartzbaum has already done that analysis, particularly comparing the civil willful penalty to the criminal penalties, which come with a possible five-year sentence and thus are considered very serious harm. So really, I think it's the maximum account balance for the funds that are concealed. That's the main fact this Court needs. And so I think this Court has all the factual information required. The only other factual information that's not available that was discussed in Schwartzbaum is the June 30 account balances. But that information really only goes to whether the penalty exceeded the statutory limits, and there's no argument that it did. Mr. Nixius has never claimed it did, and in fact, it didn't. So I'm not sure the Court actually needs that information. In Schwartzbaum, the June 30 balances were unknown for quite a few of the penalties that were upheld. So I think a pure question of law analysis on excessiveness could proceed even without the June 30 balances. In case it's helpful, I think there's some additional evidence in the record that could help give this Court comfort, and that is that the same funds were always in these accounts. They were rolled account to account. You see, you may be right that we could do this on our own. The question is, should we? And I think we have discretion either way, but Mr. Nixius was precluded from putting on his case on the Eighth Amendment because the District Court ruled against him on that issue. And, you know, under some thinking, he should be given a chance to put on his case, and if it fails, it fails, and if it prevails in part, it prevails in part. So why should we do it? Why shouldn't we just send it back and give Mr. Nixius his day in court and let him put on the sort of case he wanted to put on, but for the District Court's ruling? The reason I think you should do it is that there's not some wide gap or case that needs to be put on. The only missing piece of evidence is the June 30 balances in dollars, and that would only be relevant if he were arguing that any of the penalties exceeded the statutory maximum. That number isn't relevant for determining the amount of harm or the maximum account balance. So, you know, if my friend wants to argue that a particular penalty for a particular year exceeded the statutory maximum, fine, but they've not done so, and I don't think they can do so. The parties do know what the balances in these accounts were on June 30. It just wasn't, it just happened to not be put in the record because I guess it wasn't, maybe the attorneys misunderstood the relevance of that. But I think the relevance is very small, and it goes to an argument that hasn't actually been raised. As to the analysis this Court did in Schwartzbond, the other thing I'd point to is why you should proceed is I think the analysis might actually be much simpler in this case. If you look at the government's brief on page 59, we summarize the penalties by amount and by percentage. And when you start comparing those to many of the penalties that were easily upheld in Schwartzbond, you'll see that these penalties fit right in that rubric. So, for instance, the Schwartzbond UMB penalty worked out to a 14.8 percent penalty. That's still larger than the maximum penalty in this case, which would be 14.5 percent. This Court found that, you know, it simply was not grossly disproportionate to the offense of attempting to conceal nearly seven times the amount of the fine. That same analysis applies here. So, and frankly, if that analysis applies at 14.8, it should apply to our 14.5 percent penalty. And almost all the penalties in this case are under 10 percent. They're at 9.4 percent. So, you know, it should apply to those too. And as to the lowest 3 percent penalty, again, one of the penalties upheld in Schwartzbond, the 2009 Raffison account, this Court easily approved a $100,000 penalty on a $3.1 million account, which the Court recognized was about 3 percent. It's actually 3.185 percent. Here, Nixish's 2009 penalty is 2.82 percent. These penalties just aren't excessive. And then when you consider that Schwartzbond actually approved 50 percent account penalties, I think in light of that, these really shouldn't be subject to question. So the answer, why should you do the analysis, I agree, you could decide not to. But there's not that much left to be done. But I mean, again, if I remember correctly in Schwartzbond, because I was on that panel, I don't think Mr. Schwartzbond voluntarily told the government he had foreign accounts, unlike here. Well, he came forward voluntarily after the fact. But that doesn't undo what he had already done. You're talking about who? Mr. Nixish. Mr. Nixish came forward voluntarily. I understand that. But I think Mr. Schwartzbond did not. I understand. Right. So again, that's a factual analysis. And there, Mr. Schwartzbond did not voluntarily come up at any point, unlike Mr. Nixish. Yes, that's true. But consider, the question is simply whether these penalties are constitutionally excessive. I think they fall toward the bottom of the range that could have been imposed. And I don't think there should be any question that they're constitutionally excessive. They're not grossly disproportionate. Under 10% for almost all of them, under 3% for one of them, I think if this Court goes account by account, it'll see that these penalties are not very high. So it may be that Mr. Schwartzbond was a much worse actor, but Mr. Nixish didn't get anywhere close to 50% penalties. And he still hid millions of dollars abroad. So I guess that's my pitch for why this Court should do it. All right. Thank you. Let's move on to the other issues. Sure. Can you tell me why the government hasn't returned the $400,000 that Mr. Nixish paid? Yes, I think so. Mr. Nixish has not filed a formal claim for refund. How much more formal do you have to be than demanding it in writing in a case that was in an adversarial posture, in negotiations for a settlement? Well, demanding it in writing, Your Honor, what he's describing is one line in a letter that said, I'd like my payment returned. A formal claim for refund? Is that unclear? Well, whether or not it's clear, it's not on the right form and it's not spelled out. And what would the form have to be so that we know? I think it's a Form 843. It's a standard form for filing claims. What does that form say? Give me my money back. Yeah, effectively, Your Honor. Sure. So what's the difference between that and the letter? Yeah, the difference is the statutory and regulatory requirements. A formal claim is a formal claim. What an informal claim could do, assuming he's filed one, an informal claim would need to be in writing. It would hold the statute of limitations open. That's it. Then you have to file a formal claim. Then a formal claim can be considered administratively. Yes, no. And if you don't like how it's being considered administratively, you can file a refund suit. That's very common. But the start of that process is a formal claim for refund. Right, but a refund suit, normally a refund suit is you pay your taxes and then there's there's an understanding that you overpaid. And so you want your refund back. But here, this is an adversarial proceeding where this individual paid money to the government thinking there was a settlement. The government took the check, cashed it, and now won't return it, even though they say there's no settlement agreement. Yeah, what shouldn't be overlooked is they made a tax-related payment. And it was designated as a tax payment. So it's in the tax system. And the way you get that back is to use the statutory regulatory procedures. Yes, it's a hoop to jump through. But I think as I think the point you're on. Is there anything in the statutes or the regs that say that that applies to a payment made in apparent compromise of a dispute as opposed to an actual payment like Judge Lagoa said on your tax returns? Well, yes, I think so, because the payment you're talking about, Your Honor, whether in in a tax return or in a dispute as a tax is designated towards tax. It's toward Title 26. So once you've made a tax-related payment, a Title 26 payment into the tax system, it's in it's in the tax plumbing, so to speak. And to get it out, you have to follow the procedures. Now, I'd like to follow up on a point. I'm kind of curious. So if they filed a adversarial proceeding now for a refund, is the government going to contest that? I'm not sure, Your Honor, but before they could file an adversarial proceeding for a refund, they have to first file a formal claim for refund so that it could be administratively  They've not done so. And I think to the court's point earlier, they've not done so, I think probably tactically because it would eliminate a satisfaction defense. You understand that if a formal claim is filed and you don't give it back, you're going to be right back where you started from, defending an accord and satisfaction claim. Well, Your Honor, if you look at page 44 of our brief, the Department of Justice has said that if this judgment is affirmed, the Department of Justice will treat the $419,000 credit as a credit against the judgment and not seek to collect it, except to the extent the IRS refunds it. That's different than refunding it. Well, what we're trying to say is we agree he deserves credit. We'll keep it, but we'll give you a credit for it. Yes, but the thing is he owes us $2.2 million. He gave you that under the mistaken. Well, I'll take the government's position on this. He gave it to you under the mistaken impression that you had an agreement. If you're right and he's wrong and there was no agreement, that money doesn't belong to you. We don't claim that it does. But why not give it back if this judgment is affirmed? To get it out of the Treasury, you have to file the form. Yes, but not just that. You have to be authorized by statute. So who has to be authorized by statute? Anyone. It's an appropriations clause issue, right? That's where the refund procedures come from. It's a statutory authorization to get money out of the Treasury. And I'd just like to point out that it's actually a term of the offer that he makes this payment, right? He makes this payment for the offer to even be considered. And that's not unusual. That's common. In fact, if you look at 7122, the settlement statute, it now requires lump sum payments or periodic payments to even have an offer be considered. It's been about 20 years it's required that. So this isn't unusual for someone to come in and have to make a payment with their offer. That's a great system. It's normally mob-like, right? That means that now, and like you said, it may have been going on for 20 years, but no wonder everybody hates the IRS. Because you're required to pay for the offer to even be considered, which is fine. But then, if the IRS decides not to approve the offer and say, sorry, we don't really have an agreement, nobody's approved it, whatever, the IRS says, we're keeping your money, unless you go through this formal procedure. And by the way, there's no guarantee that we're going to give you the money back. As a matter of fact, DOJ says, if we win this lawsuit, we'll keep the money, but we're going to be good. We're going to credit it for you. We're not giving you back your money. That's not money that belongs to you, if there's no agreement. Well, Your Honor, you're just hiding behind, hiding is just too strong a term. You're doing your job for a client, and this is not a personal dig. But the government is hiding behind formalities and technicalities. And yes, it's been said that when you deal with the government, you better turn square corners. But you expect the government to turn them that way too, when it deals with citizens. Well, I would like to point out to the Court that the formalities are also slightly more complicated. And we unpacked this in a footnote in our brief. But when Mr. Nixitch made the payment by check at the end of this process, along with the offer to be considered, that was only $331,000. Whatever the sum is. He gave you hundreds of thousands of dollars. I know there was $100,000 and something from another period that gets added to that. And the total is now $400,000. But that's part of why it's so complicated. That's part of why the formalities are there. That those things have to be unwound. And so, yes, the $157,000 received in 2015 as a credit on his tax accounts, that has to be processed in a certain way, as does the other money that got into the system in a certain way. I understand it's not helpful that there are these formalities. But I think that, you know, the formalities have been set up. It's just that, like, the closing agreement, when you look at the closing agreement, it doesn't say, you know, offer to be considered. You know, it says closing agreement. And then at the end, this agreement is final and conclusive. And then it says, you know, it can be reopened in the event of fraud, malfeasance, misrepresentation. I mean, it's just, it is really very disconcerting that the government treats citizens in this manner. But I'd like to go back to a point that was brought up originally with counsel on the other side, which is, can you tell me where in the record it tells me who exactly had actual authority to sign this closing agreement? This form 906, since we like to be so formalistic here. No, I think that the record doesn't give a specific name. It says a technical services group manager. Do you know who had actual authority? Can you tell this court here today, as you stand here today, who had actual authority to sign this? No. Was there more than one person? Yes. It would have gone from the technical services group and probably up, right? Because it's been delegated down. Everybody who's listed in that long clause of the IRS manual? Sure, and the secretary and the commissioner. Well, the form itself says the commissioner of the Internal Revenue Service. But it could be by his representative. Yes, yes. So, you know, the delegation... And who was his representative? How was a citizen supposed to know who has actual authority to sign this form 906? Well, I think you could find out. I just think it hasn't... A specific name hasn't been relevant to this case. Just to point out, the arguments made here are just that the people he dealt with clearly didn't have authority. And I don't think... Another issue is... Right. Your position is that if you look at the IRS manual, you get categories of positions who can authorize a settlement. Yes. Right. And none of the people in those positions approved this one. Therefore, there was no agreement on the government side. That's right. You have to have actual authority. Right. I understand that. Yeah. But who is... But there's... I'm sorry. Go ahead. This is not a tax penalty, right? It's a Title 31 penalty. So where do I go to find out who can authorize and compromise a Title 31 penalty? Yeah. That's also in the Internal Revenue Code. And if you look at the back of our brief, we've included that as well. What section is it? It is... One second. It's 1.2.2.14.13. 1.2? Yep. 1.2.2.14.13. That's not the code. That's the IRM. That's the manual. Yes. That's where they publish the delegations. I know, but that's not the code. Yeah. The IRS manual is not the code. It's not a statute. Oh, I'm sorry. I misunderstood the question. I don't think you're going to find that in a statute. What you're going to find is authority for the top-level figures, like the secretary and the commissioner, to delegate. Right. And then you'll find delegation orders. Those might be published somewhere. They might not have been. And only if authority was delegated would they have actual authority. And the way you... But you need a delegation order. If somebody in that clause of the IRS manual had approved this without a delegation order, would that have been okay? No one could approve something without a delegation order. And the delegation orders are specific or general? They're general to position. And where's the delegation order? Yeah. I was just reading the delegation order numbers. So what you have is a system that is, the FBAR can be settled by anyone who has authority to enter into and agree to a closing agreement. And then you have the regular... I'm reading this thing. It says, to enter into approval written agreement for FBAR penalty. It just says, delegated to officials authorized to enter into an approved closing agreement. Yes.  That's it. Which is really weird because when you look at the other stuff, it tells you specifically like, to sign agreements extending the periods of limitations on FBAR penalties. It has very specific people like group managers, GS 11 revenue agents, GS tax compliance officers. Yes. I mean, it's much more specific. So officials authorized to enter into an approved closing agreement. Well, who are those individuals?  So you have to look to the individuals that are authorized to approve closing agreements. And that's in the prior delegation order. The one that... What delegation order? 1.2.2.9.3. Which is for title 26? Yes. Not for title 31? For closing agreements. Closing agreements are a title 26 thing. So who are we supposed to look at to find out who can compromise a title 31 FBAR penalty? Yes. So the delegation of authority to do that for FBAR... I don't think you actually have a delegation order. I think you're just making it up. Because that delegation order doesn't pertain to FBAR penalties. Well, I... Is there a delegation order for FBAR penalties? This is my understanding is this is the delegation order for FBAR penalties. The regulation. It's not a regulation. It's an IRM delegation. It's... Testified to that. What? Who testified to that? Testified to what? To what you're saying. What do you mean testified? That has the authority that that pertains to FBAR penalties. That can sign the closing agreements. I'm afraid I don't understand. Let's do it in steps. You say that the manual in section 1.2.2.14.13 provides the authority to settle an FBAR penalty, right? Yes. Okay. You have it there in front of you? Yes. Can you read it for me out loud?  To enter into and approve a written agreement with any person relating to the person's civil liability for an FBAR penalty other than an agreement to extend the period of limitations on assessment or collection of civil FBAR penalties. And the next provision says it is delegated to officials authorized to enter into and approve closing agreements. That tells me nothing. It tells you something, though, when you understand, I think this is where I could add maybe to the tax perspective. 26 U.S.C. 7121 authorizes closing agreements. It's sort of a bread and butter function of the IRS to do these closing agreements. And so there's separate authorities. You're just reading from the manual. I need to see a delegation order because you cannot delegate the authority of the commissioner just by thin air. Well, Your Honor, we're not actually just reading from a manual. The manual happens to be where the delegation order got made and published. But this is not a delegation order. It's a regulation that says how delegation generally works, right? I actually think it is the delegation order. You're telling me this is a delegation order? Yes. For forever, without temporal time limits? Well, it could be changed. But this is the delegation order. That's right. What court has ever addressed this issue of who can settle FBAR penalties under this regulation in the manual? I'm not certain it's ever come up, Your Honor. I know because it's a mess. It's a mess. I understand. The IRS manual has this going for it. It says to settle an IRS Title 26 tax penalty or issue to compromise it. And then it gives a long list of people by position. So you at least, if you're the taxpayer or the Taxpayers Council, you look at that and you say, Assistant Regional Director. Okay, he's in. So if he signs it, I presume that he can approve the settlement. This one for Title 31 penalties doesn't tell you anything. And it doesn't refer you to anything else as a cross-reference to figure out. I mean, does the IRS publish? The manual? No. Who gets delegated authority for a Title 31 penalty? This is where they publish it. Okay. What does it say? Who's delegated authority? Yes. Well, who? The officials that are authorized to enter into an approved closing agreement. Who are they? We don't know who they are. That's the whole point. But you do know when you look back to the delegation as to closing agreements. I think the intent here is to mirror the authority so that those that can enter closing agreements can also, you know. Your argument is that neither Daniel Ford nor Michael Counts falls within any of those classifications. They definitely do not, Your Honor. Based on who? Based on what you're telling us? Because I don't see anything in the record that tells me that. I think there's a lot in the record that says that. I think the district court also found it, that the authority goes through the technical services group and these individuals were not in the technical service group. In fact, when they were done. How did the district court come to that? I understand the point that Judge Wilson made, which is whatever you think of this mess, these agents didn't have the authority to settle. I understand that. But we have to write an opinion about delegated authority. And so we have to do our best to try to get it right. And I'm not sure I understand, without a cross-reference in this regulation you cited to, what we go to to find out what positions have delegated authority to settle a Title 31 penalty. Sure. But keep in mind, Your Honor, you also don't have an agreement being entered. So, you know, no one settled this penalty. I don't know if you'll have to get into the delegations because it wasn't settled. Right. You could decide this case very narrowly on the point that, Judge, if we agree with you on the point that Judge Wilson made. But we haven't conferred. And I don't know how we're going to decide this case, either in terms of result or in terms of analysis. And so one of the other options is always to provide an opinion that provides some guidance to future litigants and judges about how this delegation thing works for Title 31. And that's what Judge Legault and I are trying to get some sort of a handle on. Let me let me try to provide two helpful points. Is it your position also that Attorney Taylor also did not have authority? She definitely did not have authority. But two helpful points if you are thinking of writing that opinion. You know, the IRS, in creating this OBDP program, puts, you know, talks about a placeholder Title 26 miscellaneous penalty for two reasons, right? This is a catch-all penalty that basically says, fine, we will not examine you and throw the book at you from all these different statutes, most of which are Title 26. Can I just ask you before you, and I'm sure Judge Jordan will give you more time, but my understanding is that FinCEN, this is originally under FinCEN's bucket, okay? Yes. FinCEN then delegated its authority to enforce FBAR requirements and penalties to the Commissioner of the IRS. Yes. Okay. So once the Commissioner had authority, then the Commissioner, I think, mirrored the authority for FBARs to those for closing agreements. I mean, this is where you lost me. I just don't think that you can just say in here, the manual having something that says, officials authorized to enter into and approve closing agreements. First of all, I'm not even sure that process-wise, notice requirements, it gives no information. At least for other requirements, it tells you, you know, you know, you have team managers, you have special agents in charge. It gives you who exactly that person is. But here, officials authorized to enter into and approve closing agreements, that means nothing because there is no, it references no delegation order. Then a citizen can then say, okay, this is who I need to now negotiate with. I mean, a citizen should not have to go hire a lawyer. A citizen should be able to negotiate fairly with the government and not have to, like, do a maze in order to, in order to be able to figure out what its rights are. Well, I understand your point, Your Honor. But I think, respectfully, when people start to interact with the government, you know, and I know this personally, you know, you interact with line attorneys. You usually interact with low-level people. They are authorized to negotiate, to recommend, but not accept. And it's usually pretty unlikely that their recommendations are not followed. But this is one of those cases where the recommendations were not followed. All right. Thank you, Your Honor. We've taken you way beyond your time, but thank you very much for the help. Thank you. Okay, Mr. Lee. Despite all of this mess that Judge Legault and I have created, or potentially created, how do you get around the fact that neither of these agents seem to have been authorized to compromise the FBAR issue with your client? We come back to something I said when I made my opening remarks, that there is this provision in the Internal Revenue Manual, which imbues the revenue agent and his, in this case, his manager, with the authority to, with authority and discretion, to determine the appropriate amount of an FBAR penalty for a taxpayer. And that's exactly what happened here. There was a negotiation between Mr. Can you tell me, do you have that provision handy? Can you tell me what that is, please? Yes. It is Internal Revenue Manual Section 4.26.16.6.7. Can you repeat that again one more time? Sure. 4.26.16.6.7. Okay. Thank you. And that's, I think the record makes it very clear, that's exactly what happened here. There was a negotiation between the parties as to the amount of the FBAR penalty. That was the only thing that was in dispute at this point. The record, which we established below by taking the deposition of the revenue agent, shows that the negotiation surrounded how much is the appropriate FBAR penalty in this case. The parties went back and forth and ultimately calculated... So that provision that you just cited says that the reviewing agents have the authority to bind the Internal Revenue Service to an agreement? It doesn't say that exactly, Your Honor. What it says is that the front line agent, the revenue agent, has the discretion to determine the amount of the penalty and it says that that has to be approved in writing by his or her manager. Which did not happen in this case. It was approved in writing by the manager, Mr. Counts. It absolutely was. And the record is... Why isn't the agreement signed by a representative of the Commissioner of the Internal Revenue Service? Well, I mean, we were told that only months later that that agreement wasn't going to be signed. But if I accept your argument, there's no need for a representative of the Commissioner of the Internal Revenue Service to sign the written agreement. And again, that comes back to our argument that this is an accord in satisfaction. We're not arguing, we're not, we didn't, we're not saying that they breached the closing agreement. What happened here was an accord in satisfaction. It was the accord was reached. The money was paid. The money paid, was paid, received by the IRS kept in satisfaction of a disputed claim. I want to go to a question the Court had asked about the refund procedures and something that my colleague talked about. One thing that I think is very complicated about this case is the interplay between Title 31 and Title 26. The money that Mr. Nixitch paid, the negotiation that led to the accord was about the amount of the APAR penalty, which unquestionably arises under Title 31. And he paid that. It's our position that all of the Title 26 refund procedures, including the Form 843 that was mentioned, don't apply here. This is not a tax payment. This is not an income tax overpayment. So whether it was an informal claim, a formal claim, a Form 843, whatever, those procedures in our view don't apply because this was a payment of a penalty under an entirely different title of the United States Code. In order for there to be an accord in satisfaction, there have to be competent parties on both sides. Competent parties. Correct. And Your Honor, to that point, Mr. Nixitch was never told that Agent Ford, Group Manager Michael Counts, IRS Office of Chief Counsel Attorney Breonna Taylor, didn't have authority to negotiate with him and reach an agreement as to the amount of the penalty. And to the contrary, he was told that they did. And in fact, they did because he paid them money. Thank you very much. Thank you both very much. Thank you. Okay, take your time setting up our third case.